Mr. Franklin, you've got ten minutes. Are my understandings that you deserve, too? Thank you. Thank you, Your Honors. I may please the Court. Jonathan Franklin for the Appellants. To prove market manipulation in this case, the SEC was required to prove two distinct and separate elements. First, the SEC was required to prove the existence of a manipulative act, which under the Supreme Court's precedent at Santa Fe means a practice that artificially affects market activity. And second, the SEC was required to independently and separately prove scienter, which is the defendant's knowing intent to engage in that manipulative act. And in the jury instructions that were challenged below and on appeal, the district court erroneously collapsed those two elements into one, tautologically instructing the jury that it could find the existence of a manipulative act through ordinary market activity based on the defendant's intent to engage in a manipulative act. So on that point, do you mind explaining to us how you think the best delineation between a manipulative act, which everybody, including the circuit, thinks requires some sort of intent, and scienter? Sure. Scienter is an additional requirement, Your Honor. And in the ATSI case, the court said that for ordinary market, open market activity, which is all we have here, to constitute artificial manipulation, there must be something more. In that case, it was short trading and they said short selling. They said it had to be something more. But you're not defining scienter, right? You just defined a manipulative act again. So the part that I was struggling with is that you're arguing that they're too distinct, but then the arguments collapse upon themselves even when you are arguing them. No, they don't, Your Honor, because I was about to say the something more, whatever it is. And I can tell you what we think the something more is. But whatever that something more is, it's not scienter. Because scienter is an additional thing that the SEC must prove separately. We think the something more is some mechanism by which the defendant artificially affects prices or the market. So you have that. Again, we've shown all of the cases have that element to it. And that's distinct from scienter. Scienter is a separate- Would employing an offer to sell but not intending or presenting it in a way such that the likelihood of it being accepted, that it wouldn't be accepted but it might have an effect upon the market, knowingly and intentionally doing it that way, would that be an indication of scienter? Scienter, yes, Your Honor. And we're talking here- Proof of the fact that a number of those offers weren't accepted but they did have an effect upon the market, would that be proof of scienter? Again, scienter is the knowing intent to engage in a manipulative act. Before one gets to that, though, Your Honor, we have to find the manipulative act. We know that your client's engaged in, I love these terms, loud and quiet offers. I missed that. Loud and quiet offers. Oh, yeah, loud side offers. So let me give you an example, Your Honor, with the Costa case, which I believe is- What makes it loud? Well, clearly, these are terms the SEC made up for this case. But in the SEC's view, the loud offers would be the multiple offers that were placed on one side versus the quiet side, which was the other offer on the other side. Now, let me just give you- Which one loud or one quiet? I believe it was because in most instances, if not all, the loud orders were the disclosed orders and the quiet orders were- I think so, it's publicly known. The loud offers are publicly known. Yes, and there's nothing illegal or unlawful about not disclosing an offer. I'm not sure that was, but my question to you was, is there proof that those loud offers, that the statistics show that they weren't intending them to be accepted? That they used them in some way, though, to affect market price? Let me finish. Yes, Your Honor. I mean, this is a very intricate argument you've made here, and it involves a number of financial products with which yours truly is not regularly familiar, all right? But the proof is, or the assertion is, is that these loud offers were not fraudulent offers in the sense, they weren't true offers. They were merely intended to affect the marketplace. Well, even the defendant's own expert admitted that they were not literally fake offers because they were capable and- Well, some were accepted, that's true. That's not what makes it manipulative. What makes it manipulative is that one accepts it. Some of them might be accepted, but the vast majority, if they're not, that then is helpful to them and drives the market up as their intent is, so that their bids are then accepted. And they make their money on the quiet bid, right? Our position, Your Honor, is that what makes it manipulative cannot be the mere intent. Let me give you a hypothetical example. Why not? If the intent is to manipulate, isn't then scienter implied from that? Scienter, yes, maybe, but not the actual act. And let me give you an example. If I were to leave this- You're slicing that onion extraordinarily thin. I don't think so, Your Honor. If I were to leave this argument and place a single order to buy a single share of stock under the- That's not this case. Well, I know that.  Give me a hundred of them. In this case, the entire- Which three are accepted? In this case, the entire theory of the SEC's case was that the so-called loud orders were quote-unquote fake or non-bonafide and therefore created not real artificial demand based solely- They didn't mean it. Based solely on the insubjective intent of the trader. So if the trader had engaged in exactly the same act with a different intent, there would be no manipulation. And we are submitting that the intent is a separate act. The manipulative act must be proven separately from the intent. And what the- Can I- On that point, and I do want to make sure that my colleague is able to ask more questions, why isn't the loud side the artificial impacting or the artificial information? If they aren't legitimate and you're saying that there's something more, why isn't that a- Because they were legitimate, Your Honor, and they did execute more than a billion times. And there was nothing that the defendants did to prevent their orders from executing while they were live. And I'll contrast that with the Koska case. What percentage of the loud orders were within the spread? Within the spread? We don't have that on the record, Your Honor. I would say that most of them or a lot of them were. So that we have situations. Our expert had our rebuttal expert testify. He would have said that what the defendants were doing was narrowing the spread in almost every circumstance. That one or more of their offers on both sides were within the spread. So that that is a market helping- How many of the loud offers were accepted? Again, the- 8.7%. No, Your Honor, because that was, again, this gets into our second issue. That was the- There's no support for that fact on the record? No, Your Honor, because the expert self-selected a subset of- No, see, now I asked you a question, counsel, and stick with me on this. I can understand your advocacy because you don't like the expert, but did not the expert place it at 3.7%? Of the ones that he labeled layering loops, which were not the totality of the trade. I agree with the labeling, but I'm asking what was the evidence in front of the jury? You still got to convince us that the- Sure. That the district court abused her discretion. Sure. And you got to admission that, which is a high, high hurdle. I agree, Your Honor, but I would just- You're several. If I want to take that example- But you're going to answer me. Yes. Answer me with what's in the record, not with your advocacy. Tell me what's in the record. What's in the- Because that undercuts very much my reception of your answer. Understood, Your Honor. What's in the record is that the expert chose loops that, by his own definition, involved execution imbalance of more than three to one. So it is not surprising at all to find that in those loops, the execution imbalance was- Was there a bias in choosing the loops? Is that what you're saying? I'm sorry? Are you claiming there was a bias in choosing the loops? Yes. There absolutely was, Your Honor. And if I could tell you what is in the record, Your Honor- Didn't Professor Hendershot look at everyone? Didn't he look at 676 transactions? Out of- 600,000 transactions. Out of many millions. And, in fact, it is in the record that there were more than a million loops that Hendershot did not exclude where the loud side orders executed as much as or more than the quiet side orders. And you can find that at JA 132. So that's actually more loops, Your Honor. That's more than a million, 1.3 million loops that Hendershot did not include in his analysis. He included 675. There were almost twice as many loops that he excluded. And we said in our brief, without contradiction, that would be like an expert saying that inferring that a die was loaded to roll a six. Well, that goes to whether Judge Cope made a mistake- Yes. Abusive or discretion with regard to admitting that. But the evidence in front of the jury, you questioned its reliability. But there was evidence in front of the jury that the jury could infer if it believed the expert, and if the expert's testimony was appropriately admitted, that there was a significant disproportionality between loud offers that were accepted and loud offers that were made. Two points, Your Honor. First, we did challenge the admissibility, but let's put that to one side. Let's put that to one side, Your Honor. I don't write everything you've given me. But mere execution imbalance itself does not mean a manipulative act. The manipulative act is something artificial that is done, not something intended. And what the court said is that the act that is otherwise legitimate and purely lawful can become manipulative based on what's in the- Let me stop you right there, just for a second, because this is important to me. Yes. Because every one of those offers had the potential to be accepted, you used the word legitimate. Does that then, in your mind, in your view, disqualify them from being considered in the context of manipulative activity? Unless there's the something more. And here I want to, the Koska case is a good example. That's the only appellate case that I'm aware of that involves grouping or layering. And in that case, the defendant had an algorithm that he employed, a computer algorithm, where he would pull back the so-called loudside orders whenever they were about to be executed. Here, the defendants had no such algorithm, did nothing like that. A billion and more than a billion of their loudside shares did execute. And what the district court instructed the jury was that it could find- What was the case you cited? I'm sorry? What was the case you just cited? Koska. It's in the Seventh Circuit, Your Honor, not this Court. But what the district court instructed the jury was that the same act, the placing of an order in the market, otherwise legitimate order, can become manipulative based on the defendant's intent alone, nothing else. And that distinguishes this case. I know Your Honor was on the Set Capital case. Set Capital had other acts that they were taking where they knew that they were removing risk from their portfolio, essentially. Here, the risk was there. The defendant's orders executed more than a billion times. Somebody could have hit on all of them. They would have been wiped out, just like in Sullivan and Long. What is required is something more. Now, again, what we do know, though, is it's not just Sienter. What Judge Sullivan said in his Wilson opinion I think is very instructive, and that is it's hard to prove market manipulation, and it should be hard. And it should be hard because there are different elements that have to be proven, and Sienter is separate. And what Judge Sullivan said in that case sitting by designation was it's tautological, and it conflates two separate elements to instruct. In that case, the CFTC was arguing that it could prove the existence of a manipulative act solely through Sienter. And he said, no, those are two separate things. So we're not saying the SEC can never make out a case of layering. COSC is an example where a case was made out. It can be done, but what it can't do is instruct, have the jury, excuse me, the district judge instruct the jury that they can find the existence of the manipulative act based solely on what's in the defendant's mind. And if I could just- So I have a question on the topic. Yes. Your firm represented Samuel Leck before he settled, didn't it? Yes, but not these defendants in the trial court, Your Honor. I'm sorry, but not what? We did not represent these defendants in the trial court. We did represent Samuel Leck, Your Honor. So there was no conflict because the interests were not adverse, or weren't they? The interests were not adverse. He settled, but the claims were the same against both of them. So the interests are not adverse, Your Honor. Thanks. Thank you. Thank you. If I could preserve my rebuttal. You do. Thank you. You got it. Thank you. Good morning, Your Honor. May it please the court. I'm Carrie Dingell on behalf of the Securities and Exchange Commission. I'd like to start with three points in response to my colleague's argument. First is that there is no artificial requirement to show that there was an artificial impact on the market in order to make out a Section 10B claim under the Exchange Act. The second is that regardless, here we also have a Section 982 claim. Section 982 does require an artificial market impact, and so it doesn't matter. And the third is that the only correction to the jury instruction that appellants attempted to make below was adding in a sentence that said that there needed to be an artificial market impact for the Section 10B claim. Since that's clearly an incorrect statement of the law, there could not have been prejudice to them from the court refusing to consider it. So starting with the artificial market impact claim, no court has ever held that you have to show an artificial market impact in a Section 10B case. And this is why. Section 10B prohibits the use of manipulative schemes and devices. So as soon as you use the manipulative device, you have violated 10B. Regardless of whether it's- You're saying. Sorry, Your Honor. A manipulative device without scienter is enough to meet the requirements of the law. Well, no. You have to have scienter. But once you've put into place a manipulative device with scienter, which is the intent to deceive or- Well, the intent to manipulate. The intent to manipulate. Exactly, Your Honor. Once you've done that, you have violated Section 10B, regardless of whether it's successful. Well, opposing counsel says you need something more. What is that something more? And don't you need it? No, Your Honor. So the something more, I think, is met by sending the false pricing signal to the market. So this court, in the ATSI case and in the set capital case, said that you have to show that you've sent a false signal about pricing or about supply and demand to the market. And so what happens when you trade with manipulative intent is that that requirement is met by your concealment of either your true valuation of the stock or by the artificial supply and demand. So here, in the layering, with respect to the layering claim, they were placing these loud side orders on the market in an attempt to move the share price. And those loud side orders sent a false signal of demand to the market, if there were orders to buy, because they would make the market think that there were more orders at a higher price. So this is just a high-tech, high-speed pump and dump, isn't it? It's similar. It is somewhat similar to a pump and dump, Your Honor. In a pump and dump, you generally also have misstatements of trying to pump up the stock. Right, but all it is is just faster and more technologically sophisticated than calling people and saying, I have a stock tip for you. Yes, Your Honor. So what they were doing was, over hundreds of thousands of times that our expert was able to identify, they were putting orders into the market that they did not intend to execute in order to drive up the share price. And then as soon as they drove up the share price and were able to execute on the opposite side of the market, they would cancel the outstanding orders. So that satisfies the false signal requirement. That is the something more. And I think, you know, if you look at the case law, I think appellants try to make out this sort of split between the Third Circuit's case in GFL and the D.C. Circuit's case in Markowski. But even in GFL, the Third Circuit case on which they rely, the court said that the defendant, who was asserting market manipulation as an affirmative defense, appeared to be correct that he did not have to show that the plaintiff had artificially depressed prices. So it's your position that there's not a circuit split and that they can be harmonized because the act of manipulation is what's injecting the false information. Exactly. Exactly, Your Honor. And I think that this court's case in set capital shows how those are harmonized. Because in the set capital case, Credit Suisse, which Judge Ballard will be very familiar with this, having been on the panel, but Credit Suisse was engaging in real trades in the market. But the court said it is no defense that Credit Suisse's transactions were visible to the market and reflected otherwise legal activity. Open market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent. Counsel, you argued before the, were you a trial judge, trial counsel? I was not, Your Honor. Well, the SEC argued in any event to keep out the expert report of Dr. Ian Bodek. I've read that report, and I've read the other reports, and I don't think any one of them are more or less filled with jargon. Can you tell me what was wrong? I think it makes a lot of sense. It makes a lot of sense to me, Dr. Bodek. So tell me what the SEC found objectionable in that report. Your Honor, so what the SEC's experts did was take a look at all of Avalon's trading. Well, we just heard it wasn't all. We just heard it was- Well, they did start with the full body of trades, and then they applied certain criteria to cut it down to what they could identify as the manipulative schemes, the layering, and the cross-market strategy. What Mr. Bodek did was he just focused on eight loops. They were part of the same eight? They were part of the group that Dr. Pierson used, weren't they? They were the eight that Dr. Hendershot had focused on, but instead of conducting his own analysis of trades, he simply decided that he could extrapolate from those eight to the full universe. But that's what rebuttal testimony should be. He was attacking the original thesis of Hendershot and Pierson. He doesn't have to give a whole alternative theory, just say what's wrong with theirs. I think it was perhaps improperly kept out of the trial. Well, I'll give you an example, Your Honor. So one of the things that Mr. Bodek did was he disaggregated the loud side and quiet side orders, claimed without any support that they were part of separate legitimate trading strategies. So you're talking about orders in the same stock, buy and sell orders in the same stock, occurring within a minute of one another. And he just argued without any support that these were actually part of separate strategies. But doesn't that go to the weight of the evidence? It could, Your Honor, but- I mean, to keep it out entirely, to not have any rebuttal to these two expert opinions, seems to me a certain level of unfairness. Your Honor, each individual expert has to meet the Rule 702 requirements. And Judge Cote wrote an 80-page opinion on the Daubert motions and called Bodek's report unintelligible. That's what she said, but I read it and I found it intelligible. Isn't that a question for the jury? Your Honor, I think she's the gatekeeper of the evidence before the trial court. And, you know, if you read Judge Bodek's report, we've included it in full at JA-268 and JA-318 of the record. I mean, you know, I also find it unintelligible. But you find Hendershot intelligible and Pearson intelligible and Bodek not? Yes, Your Honor, because I think there was an attempt by the SEC's experts to explain the definitions and to explain why the parameters that they were using to analyze the data made sense, you know, why, for example- So I read all of these reports, and my, I know, painful. And my feeling is, is that one is no more jargony than the others. They all have their jargon, they all have their point of view, they all have their biases. And the rebuttal testimony has a different purpose at trial than the original testimony. And they didn't get the benefit of that. He's allowed to criticize the other testimony. That's his job as a rebuttal witness. Your Honor, to the extent that the court feels that there was prejudice from excluding the report, I would point to two facts. One is that they were able to cross-examine the SEC's experts. And they used many of the hypotheses that were in Mr. Bodek's report in that cross-examination. Second, the evidence is, you know, the record was rife with evidence that these schemes were going on. And, in fact, that they sent a false pricing signal to the market. If you start at JA 855, we included the first ten exhibits that the SEC admitted at trial. And at JA 855, you know, Mr. Fair is writing to a trader and he says, we're engaged, you know, I understand you would like to engage in layering. We're one of the few places that allows layering. So they had, we had the appellant's own testimony. We had regulators who testified about what these schemes were and why they had concerns about evidence. Is layering per se illegal according to the SEC? This form of layering, yes, is a manipulative strategy. So wait, just ordinary layering of trying to time your puts and calls? Is that illegal? No, what is illegal is placing orders in the market in order to move the share price or to move. Pump and dump, we're back to pump and dump. Yes, Your Honor. So that, when I talk about layering, I'm talking about putting orders on one side of the market in order to move the price. And that is illegal. And so, you know, there was lots of other evidence. There was evidence from other market participants that they saw this going on. And, you know, but it's very difficult to tell because of the number of trades occurring all across the market. You know, other market participants couldn't see the full scope of what was happening, the full pattern. But they testified that they would stop, market makers would stop trading. Is there a reason it's illegal, you find it illegal? Is it because they made so much damn money? Well, Your Honor, it is true that they, I believe with the layering, it was 45% of their revenue despite the fact that it was only less than 5% of their trades. And so, you know, a lot of money was being made. It's not, you know, per se, you know, improper to make a lot of money off of, you know, trading. Obviously, that's a big part of why people trade in the market. But you can't manipulate the market. And you can do two things. You can trade for investment purpose because you actually want to buy the underlying stock. Or you can speculate. That's things like short selling and arbitrage where you identify a disparity already in the market and take advantage of it. You know, if you look at the history of the Exchange Act and the House report that we cite in our brief at pages 10 and 11 is, you know, excellent on this. If you look at, you know, the history of the Exchange Act, it said you could invest for an investment purpose or for speculation. But Congress wanted to bar manipulation. They didn't want parties to be able to go in and change the prices of stocks in the market to the detriment of other market participants. So I see my time is up unless the Court has any further questions. Thank you, Your Honors. Thank you, Your Honors. I'd just like to follow up a bit on Judge Pooler's comments. If the Court is not inclined to say that the Court erred in excluding the SEC expert, I do agree at a bare minimum it should have, the Court should have allowed the rebuttal expert. Do you think you'd get a new trial if that was error? Yes, Your Honor. And I think it's critical in this case because the SEC's expert were, in fact, their entire case. They were the only witnesses who testified about what was consistent with manipulation or not. The defendants themselves were not traders. So they couldn't explain any trading activity because they were not doing it. And Judge Wesley, I think in answer to some of your questions, you were kind of rightfully asking where is it in the record. And a lot of that evidence, Your Honor, was actually in the rebuttal report that Judge Pooler has noted that was excluded. And that was the evidence that would have shown to the jury, at least allowed them to conclude, that what the defendants were doing was not manipulative but was, in fact, a strategy of price discovery or exploratory trading or the other things that Mr. Bodek criticized the experts on. And I would just note on the jury instructions, Your Honor, what I heard from the other side is that what happened was an injection of false information into the market. That's their theory. And I agree that is their theory. But the only thing, the only thing that made that false information, according to them, was the defendants' subjective intent. If the defendants had intended or really hoped that Counselor, that's not how I heard her argument. I heard that it moved, it moved prices. Actually, her first argument was it didn't have to move prices. No, I agree that she said that she didn't. And we can quibble over whether or not we create a standard that says intent alone. But I think the argument is that even if there was a something more, they'd have it here, and they would have it in manipulation cases because the false information based on the intent artificially changes where prices are. But again, the false information based on the aspirational, the unintended prices, the loud orders, change where the market is. But the simple fact is, Your Honor, you cannot find falsity here without the intent. If the same orders were placed in the market, but they subjectively intended or hoped that somebody would execute on them. Right, but then isn't that the true valuation of the market, then? No, even if the market moved in the same direction, even if the orders were not accepted, they would, under the FEC's theory, be legitimate, non-manipulative. And that's where we have the problem because it conflates two things, the manipulative act and the intent. You cannot find falsity under the FEC's theory without looking at the intent of the actor. And again, I know you don't want to hear a hypothetical, but I'll just give you a quick one. If I were to go out and buy one share of stock and order one share of stock, and I subjectively intend, for whatever reason, hope that no one's going to accept it, that is, under this jury instruction, market manipulation because I have injected a false impression of demand. But if I did the same exact thing, placed an order, and even if nobody took, even if somebody did take the order, if I did the exact same thing, but in my head I say, ah, I hope somebody does take it, it's not, even if nobody does and even if it moves the market. That shows a conflation of intent with the act of manipulation. That was the first error. The second error, Your Honor, was on the evidence, and I think that is sufficient to reverse so we can have the jury hear all of the evidence, not just one side of the evidence. And this was a completely one-sided case. Thank you. Thank you so much. We do appreciate it. Thank you. We will take this matter under advisory.